HOLI–REST, INC., Pearl Coll, Appellees
and Cross-Appellants,

v.

Max B. TRELOAR, Appellant and
Cross-Appellee.

No. 56375.

Supreme Court of Iowa.

April 24, 1974.

518

Arthur H. Johnson of Johnson, Burnquist, Erb, Latham & Gibb, Fort Dodge, for appellant, cross-appellee.

Claire F. Carlson, of Kersten, Opheim, Carlson & Estes, Fort Dodge, and Richardson & Handley, of Jefferson, for appellees, cross-appellants.

Heard before MOORE, C. J., and MASON, LeGRAND, REYNOLDSON and HARRIS, JJ.

REYNOLDSON, Justice.

This appeal arises out of a stockholder's derivative action initiated by shareholder Pearl Coll for the corporation Holi-Rest, Inc., and in her own right, against Max B. Treloar. Trial court rendered judgments against Treloar on behalf of the corporation for $10,500, on behalf of Mrs. Coll for $6750, and taxed the costs against him. Treloar appeals from those judgments. Holi-Rest and Mrs. Coll cross appeal from trial court's failure to award all of the relief prayed for. We affirm in part, reverse in part, modify and remand with instructions.

Treloar was reared in his father's restaurant business in Fort Dodge. He first started to manage a restaurant in 1950 and subsequently controlled three or four such businesses. Mrs. Coll started working for Treloar in 1957. She was a valuable employee, and when negotiations hereafter referred to occurred she was managing his place called "Pancake Feast."

In 1963 a Holiday Inn was under construction in Fort Dodge. In September 1963 Treloar became interested in acquiring the franchise for the restaurant and lounge portion of this operation. He testified he did not want to enter this venture without the management services of Mrs. Coll, and talked to her about making an investment in the facility.

Mrs. Coll testified Treloar approached her concerning an ownership share in the business, which was to be a partnership. She told him she could "put in $10,000." She further testified she contributed this sum to the venture in February 1964, after taking $5000 from a savings account, and borrowing $2000 from her sister and $3000 on the family car and pickup. The business began operation March 2, 1964. Articles of incorporation for "Holi-Rest, Inc." which Mrs. Coll signed as one of the incorporators, were filed March 2, 1964.

It is undisputed Mrs. Coll never contacted an attorney concerning any aspect of the venture. Treloar did that, and brought papers for her signature. Mrs. Coll claimed it was three months after the restaurant opened when Treloar told her she

could not invest $10,000 because she would then own more of the business than he did. He proposed to repay her through payroll checks of $500 per month. She received these payments, which were paid by the corporation and subject to income and social security tax deductions. She asserted she was unaware the enterprise was incorporated prior to commencing business and never read the papers presented for her execution.

Treloar testified he first told Mrs. Coll she could have any pro rata share in the corporation her investment would justify. Later, he claimed, he told her he would not "get involved with anyone" unless he owned 75 percent. The fair import of his testimony is these later alleged conversations occurred before the business commenced operations when he first consulted an attorney about incorporation; ultimately the $10,000 Mrs. Coll advanced was a loan "for the purposes of expenses and equipment and so forth" which he in fact gambled away; after the business opened and in March or April they discussed how she was to be repaid the money she was not permitted to invest in stock. Treloar claims at that time an agreement was made for $6000 to be repaid to Mrs. Coll, disguised as wages from the corporation.

Mrs. Coll's cancelled checks, placed in evidence, are payable to and endorsed by Max Treloar. The dates and amounts are: February 12, 1964, $3000; February 12, 1964, $2000; February 19, 1964, $5000. These were all cashed within two days of issue date. In evidence also is a check from Max Treloar's Pancake Feast to Pearl Coll, dated February 29, 1964, in the sum of $500 (conceded by Treloar to be a bonus for work at that cafe) and another from Treloar New Products Co. (owned by Treloar) to Pearl Coll dated March 24, 1964, for $3500. Upon receipt of these last two checks Mrs. Coll wrote still another check to Treloar dated March 24, 1964, in the amount of $4000. The last check, together with Treloar's check for $15,000 and eight small checks, all for $175 or less,

were deposited by Treloar to the checking account of Holi-Rest, Inc. on March 25, 1964. The small checks were written as bonuses from Treloar's Inn (controlled by Treloar) to eight employees whom he wanted to acquire stock in Holi-Rest. The total deposit was $20,000 and purported to represent funds for the purchase of 800 shares in the corporation at $25 per share. Concerning the final check exchange, Mrs. Coll testified, "I am not sure what the purpose of this transaction was except to show that this was what I invested into the business." She received 160 shares, and claimed these shares were delivered in the fall of 1964. A stock purchase agreement Mrs. Coll signed in December of that year clearly set out her ownership of 160 shares and Treloar's ownership of 600 shares.

Mrs. Coll was the manager of the Holi-Rest facility from March 1, 1964 until May 30, 1967, when she quit work pursuant to a written resignation. The pattern of her compensation was $500 per month, and a ten percent monthly bonus on profits. At the end of each fiscal year she was credited with 20 percent of the profit, which was the pro rata share her stock ownership in the "subchapter S" corporation would warrant.

In 1964 Holi-Rest purchased an automobile for Mrs. Coll to use. It belonged to Treloar's brother and at the time a bank was threatening repossession. Mrs. Coll testified Treloar asked her to "turn in" her car because he owned so much more stock it would not be fair otherwise. She complied and Treloar sold her car which she valued at $750. He kept the money. This evidence was not refuted by Treloar.

Accountant's reports disclose the Holi-Rest had net income of approximately $18,100 in its first year of operation; $55,800 the second, and $40,500 in the last year it was managed by Mrs. Coll. Treloar drew no compensation for services during those years. However, his subchapter S earnings on his 600 shares of stock totaled $13,665, $38,811 and $28,180 for those periods.

Following Mrs. Coll's resignation, Treloar hired other restaurant managers. But in the fiscal years ending in 1968 through 1971 he drew an annual officer's salary of $30,000 from Holi-Rest, except in the year ending 1970, when it was reduced to $25,000. The net income dropped to $4830 for the fiscal year ending in 1968. In the fiscal year ending in 1969 there was a loss of $846; in 1970, a loss of $3900; and in the fiscal year ending in 1971, on gross sales of $544,436, Holi-Rest produced operating earnings of only $2532. As a subchapter S stockholder, Mrs. Coll received no earnings after she left the corporation.

Treloar testified, "Since the inception of this business, I have thought of this business as being my own and have pretty well dealt with it as my own." This was no understatement. On several occasions he telephoned Mrs. Coll from Las Vegas to withdraw and send him corporate funds. She never knew how these were handled on the corporate books.

Equipment was purchased from Treloar New Products Co. (later Treloar Brokerage), a sole proprietorship owned by Treloar. He did not take bids, nor did he consult with Mrs. Coll, the manager and a corporate director, regarding these purchases. He conceded, "I dealt with Holi-Rest while making a profit for myself."

Food for Holi-Rest was purchased from Treloar's Inn, which the record shows Treloar owned. Mrs. Coll testified Treloar told her "it didn't really concern us what we paid for items." She could not find out what the food had cost Treloar, but she did not know Holi-Rest paid over two or three cents a pound more than Treloar's cost for the hamburger he sold the corporation. This evidence was not refuted by Treloar.

The corporate books were kept by bookkeepers at one of the other Treloar enterprises. The accountant's "non-opinion" report for the latest year in evidence (fiscal year ending February 28, 1971) stated: "Treloar's Inn, Inc. and Treloar Broker-

age, businesses in which Mr. Max B. Treloar has a controlling interest, are major suppliers of food, restaurant supplies and equipment."

Without any evidence of corporate action, Treloar decided Holi-Rest should retain a portion of the net earnings of certain stockholders, including Mrs. Coll. Although Mrs. Coll was the corporate secretary, the few pro forma corporate minutes were all signed by Treloar, who admitted some of the purported meetings did not occur. He borrowed $30,000 of corporate funds in 1966 and consistently thereafter has been indebted to Holi-Rest. Treloar "drew ahead" on his earnings and annual salary. Consequently, the operating capital was furnished by the retained earnings of Mrs. Coll and other stockholders.

Treloar initiated the plan that Holi-Rest should repay Mrs. Coll the $6000 which he claimed was his personal indebtedness to her. He became interested in life insurance to fund a stock buy-sell agreement which he proposed to enter into with Mrs. Coll. His lawyer told him, among other things, the premiums would not be a deductible corporate expense. Nonetheless, he had Mrs. Coll procure the insurance on his life in July 1964. Treloar thereafter raised her salary in an amount sufficient to pay the premiums. He then caused to be prepared, and Mrs. Coll signed, a mandatory stock purchase agreement in which, upon his prior death, Mrs. Coll was required to pay the insurance proceeds to his estate, heirs or beneficiaries to apply on the purchase price of his stock, valued pursuant to a stipulated formula. This agreement also provided neither party should sell, transfer, dispose of or encumber any of his or her stock in the corporation without first offering it in writing for sale to the other.

Shortly after Mrs. Coll terminated her employment Treloar attempted to acquire her stock to sell to Jerry Dawson, the new manager, offering her "book value." She refused.

After Mrs. Coll had moved to Denver, Colorado, Treloar wrote to her on November 8, 1967, stating he had offered to sell his 600 shares of stock in Holi-Rest to Jerry Dawson (the then manager) for $120,000 and therefore first offered it to her for the same price, presumably pursuant to the above agreement. He postscripted the following advice:

"Pearl your stock in the Holi is not doing anything due to the fact profits are not keeping up with wages. (I am now on the payroll) I've every reason to believe Jerry will handle the same way. I am sure I would treat you better than someone else as to sale of stock. As a friend I urge you to take care of yourself in this instance while you can still get value. Frozen assets aren't worth much."

Mrs. Coll testified she offered to sell him her stock for $200 per share, but "[h]e said mine wasn't worth as much because he was selling experience, name and other things."

Other facts we deem pertinent will be set out in the divisions which follow.

Plaintiffs' petition alleged Mrs. Coll contributed $10,000 to the capital of Holi-Rest and asserted she was entitled to 240 more shares (to be deducted from Treloar's shares) subject to her return to the corporation of the net part of the $6000 she received after taxes; Treloar had engaged in self-dealing with the corporation and there should be a complete accounting; shares issued to Treloar for which he did not contribute the full value should be cancelled; Mrs. Coll was never reimbursed for the reasonable value of her car; the wrongdoing of Treloar was intentional, willful and fraudulent and he should be required to pay exemplary damages to plaintiff corporation and to Mrs. Coll. Plaintiffs prayed that Treloar be suspended from control of the corporation and a receiver be appointed; Treloar be required to account and to pay Mrs. Coll the value of her car; the stock ownership be revised to reflect the actual capital investments of each stockholder; plaintiffs be awarded the sum of $25,000 each in exemplary damages, and the court award any and all other relief found to be equitable.

Trial court found the corporation was ineptly handled and used to cover Treloar's "clandestine actions," Mrs. Coll was duped and defrauded in her investment in the restaurant but that she was estopped from complaining because she accepted the situation as evidenced by the numerous instruments she signed and because she received corporate funds disguised as wages; the $30,000 salary Treloar was paid was in excess of his worth to the corporation; that up to the time of the commencement of this action on August 1, 1968 Mrs. Coll was damaged in the sum of $6750 and Holi-Rest in the sum of $10,500. How trial court arrived at those amounts is obscure, but judgments were rendered against Treloar in conformance with those findings.

Appealing, Treloar contends trial court erred in awarding Mrs. Coll damages after finding she was estopped from making her claim; in finding his salary was in excess of his worth to the corporation; in recognizing a fiduciary relationship between Treloar and Mrs. Coll, majority and minority stockholders, when the transaction between them was fair; and in finding the agreement between them was sufficiently definite to warrant enforcement.

Plaintiffs Mrs. Coll and Holi-Rest assert trial court's finding of estoppel was improper, and in any event estoppel was not a pleaded issue in the case. Cross appealing, they maintain trial court erred in failing to enforce a constructive trust in 240 shares of corporate stock against Treloar and in favor of Mrs. Coll; in failing to order Treloar to refund the illegal and excessive salary; in failing to award exemplary damages; and in failing to award attorney fees.

■ No issue is raised in this appeal concerning the deviation from the usual derivative action practice in which the corporation is made a nominal defendant. See H. Henn, Law of Corporations § 358, pp. 749–53, § 369, pp. 776–78 (2d ed. 1970); 5 Am.Jur. Pl. & Pr. Forms (Rev.) Form 22, p. 408. Of course, though the corporation is ordinarily named a defendant, it is the real plaintiff in interest, and beneficiary of any judgment recovered. Des Moines Bank & Trust Co. v. George M. Bechtel & Co., 243 Iowa 1007, 1083, 51 N.W.2d 174, 217 (1952). For these reasons and because apparently there are no stockholders other than the two who are parties in this equity action, we proceed as though the corporation is properly before the court. A court in equity may determine and decree as to the rights of the parties regardless of their positions as plaintiffs or defendants, and in a proper case may adjust rights and award relief as between co-plaintiffs and co-defendants. 30A C.J.S. Equity § 603, pp. 680–681.

■ Also at the threshold we observe no proposition for reversal is asserted based on Mrs. Coll's failure to make demand upon defendant as controlling director of the corporation to assert the corporate right. See rule 44, Rules of Civil Procedure. Of course, defendant may have been familiar with our principle of law obviating such requirement where a demand would be a vain and useless thing. Des Moines Bank & Trust Co. v. George M. Bechtel & Co., supra, 243 Iowa at 1083, 51 N.W.2d at 217.

■ I. *Scope of review.* A shareholder's derivative action is equitable in nature. It follows our review is de novo. Rule 334, R.C.P.; Holden v. Construction Machinery Company, 202 N.W.2d 348, 354–355 (Iowa 1972); Charles v. Epperson & Company, 258 Iowa 409, 413, 137 N.W.2d 605, 608 (1965). Although we are not bound by trial court's fact findings they are accorded weight, especially when considering the credibility of witnesses. Rule 344(f)(7), R.C.P.; *Holden,* supra; see Berger v. Amana Society, 257 Iowa 956, 961, 135 N.W.2d 618, 621 (1965). The equitable nature of the derivative action is fully explored in H. Henn, supra, at § 358.

II. *Mrs. Coll's individual claims against Treloar.* We first consider Mrs. Coll's effort to require a realignment of Holi-Rest stock ownership to reflect the additional $6000 Treloar obtained from her, over and above the $4000 she furnished for which she obtained stock. Trial court's denial of this relief was grounded on estoppel.

Additionally, Treloar on appeal asserts Mrs. Coll's claim is barred by laches and by her acquiescence in the stock distribution.

■ Generally, of course, these defenses are not available unless pleaded. S & M Finance Co. Fort Dodge v. Iowa State Tax Comm'n, 162 N.W.2d 505, 509 (Iowa 1968); 28 Am.Jur.2d, Estoppel and Waiver § 31, pp. 635–36, § 135, pp. 804–08. While the use of those precise words is not essential, at least allegations which support the theory must appear in the defensive pleading. Paveglio v. Firestone Tire and Rubber Company, 167 N.W.2d 636, 638–639 (Iowa 1969); Janssen v. North Iowa Conf. Pen., Inc. of Meth. Ch., 166 N.W.2d 901, 907 (Iowa 1969).

■ Here neither estoppel nor laches finds foundation in Treloar's answer. Moreover, his reply brief argument that an issue not pled but tried by consent is rightfully in the case ordinarily is not applicable to the defense of estoppel. Gibson v. Iowa Legion of Honor, 178 Iowa 1156, 1174, 159 N.W. 639, 645–646 (1916).

■ In any event, we fail to find the requisite detriment to Treloar, or any equitable considerations relating to his situation, which would impel us to apply either the doctrine of estoppel or laches. See *Holden,* supra, 202 N.W.2d at 356; Jennings v. Schmitz, 237 Iowa 580, 589, 20 N.W.2d 897, 903 (1945).

However, an overview of the evidence convinces us the initial Coll-Treloar negotiations did not result in an agreement firm enough to support a reallocation of stock ownership now. The most convincing evidence indicates that at least by the time the corporate activities commenced an understanding had been reached relating to the number of shares each was to own, which was reflected in the actual distribution of shares.

The general rule is well settled that parties to a contract may rescind it by making a new contract inconsistent with the first. 17 Am.Jur.2d, Contracts § 493, pp. 965–67; 17A C.J.S. Contracts § 394, pp. 474–75. Even if a contract is valid when made, it is possible for the parties to abandon it, or to substitute another in its place by conduct inconsistent with the continued existence of the original contract. Siebring Mfg. Co. v. Carlson Hybrid Corn Co., 246 Iowa 923, 930, 70 N.W.2d 149, 153 (1955).

Mrs. Coll's receipt for her shares in the stock book was dated March 2, 1964. While this receipt was probably signed at some later date, it is an indication of her understanding relating to stock ownership on that date. She subsequently signed without objection other instruments showing the actual division of stock. Mrs. Coll made no complaint to the accountant who reviewed with her the first year annual report which set out the then stockholders and shares owned by each.

At no time prior to the filing of her petition did Mrs. Coll protest the actual division of corporate stock as issued. Even after legal consultation with Mrs. Coll, her attorney, writing to Treloar's lawyer on December 18, 1967, made no mention of this claim. Her acceptance of repayment of $6000 of her original $10,000 advance (although in the form of wages) constituted conduct inconsistent with the original negotiations.

We do not ignore the obvious fact Mrs. Coll was dominated by Treloar. He testified, "I helped train, aid and assist her in acquiring the knowledge and know-how in the managership area. Up until the time of this lawsuit, she had been receptive to my guidance and leadership and acknowledged this." But even this situation cannot explain Mrs. Coll's continuous conduct which was totally in accord with the actual distribution of stock ownership.

Whatever may have been the preliminary negotiations between Treloar and Mrs. Coll, we find they ultimately agreed to the distribution of 160 shares to Mrs. Coll and 600 shares to Treloar. A reallocation of shares is not supported in this record.

It follows the $6000 Treloar obtained from Mrs. Coll was an advance which should have been repaid by him, not Holi-Rest. We are satisfied she was reimbursed by the corporation in an amount sufficient to repay her, including her taxes on the fictitious "wages." Consequently, Treloar owes the corporation $6000, a matter we shall treat in the next division.

The only other $6000 amount referred to in the record was a loan Mrs. Coll made to the corporation out of the profits she was permitted to withdraw. This was repaid.

Both parties agree concerning the essential aspects of the car transaction. Mrs. Coll testified her use of a maintained company car for commuting and other purposes was a "benefit in exchange for which I turned in my car." However, Treloar pocketed the money from the sale of Mrs. Coll's auto, valued in this record at $750. He owes the corporation this amount.

We conclude trial court's finding that Treloar owes Mrs. Coll $6750 is without evidentiary support. As Mrs. Coll is not entitled to actual damages, we do not award her exemplary damages. Engel v. Vernon, 215 N.W.2d 506 (Iowa 1974).

III. *Derivative claims for Holi-Rest against Treloar.* We have recently

said officers and directors of a corporate entity, particularly management-controlling directors of closely held corporations, occupy a fiduciary, or at least a quasi-fiduciary position as to the corporation and its stockholders. *Holden,* supra, 202 N.W.2d at 358. The uncontroverted facts in this case demonstrate Treloar breached this fiduciary duty in several ways, and operated the corporate affairs solely for his own benefit and not that of Holi-Rest or its stockholders.

■ There is no indication any other director or shareholder was permitted to pass on the equipment, food and supply contracts between Holi-Rest and other enterprises owned by Treloar. While neither party relies on § 496A.34, The Code, permitting a director to have an interest in a contract or transaction with his corporation under certain prescribed safeguards, it is clear in this case none of those safeguards were followed. Nor does that statute modify our common law requiring a corporation-controlling director, challenged in a self-dealing situation, to carry the burden to establish his good faith, honesty and fairness. Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281, 289 (1939); *Holden,* supra, 202 N.W.2d at 358; Charles v. Epperson & Company, supra, 258 Iowa at 414, 137 N.W.2d at 608; Gord v. Iowana Farms Milk Co., 245 Iowa 1, 17–18, 60 N.W.2d 820, 829–830 (1953); Des Moines Bank & Trust Co. v. George M. Bechtel & Co., supra, 243 Iowa at 1081, 51 N.W.2d at 216.

While Treloar has not carried his burden in this regard nor with respect to his life insurance transaction, neither have plaintiffs proved the extent of the corporate loss resulting from these breaches of duty. In this evidentiary vacuum we can only weigh these matters in awarding exemplary damages and in fashioning the remedial relief set out in division V.

The situation is different with respect to the "salary" Treloar paid himself after Mrs. Coll resigned as manager. Another manager was promptly hired. Treloar's testimony his $25,000 to $30,000 annual "salary" was justified by additional activities he assumed is not convincing. The amount paid *was* sufficient to absorb the profits and deprive Mrs. Coll of dividends. Treloar also drew a "salary" from at least two of his other restaurants, which must have also occupied his time.

Emerging from this activity was a discernible and classic pattern of the "freeze-out" technique, threatened in Treloar's letter to Mrs. Coll dated November 8, 1967 ("Frozen assets aren't worth much"), and identified in treatises on corporate conflict. See 2 F. O'Neal, Close Corporations § 8.07, pp. 43–46 (1971, Supp.1973) and authorities cited.

■ At least under the record of self-dealing presented here, we hold Treloar had the burden to establish the reasonableness of his compensation. See Des Moines Bank & Trust Co. v. George M. Bechtel & Co., supra, 243 Iowa at 1081, 51 N.W.2d at 216; Darmana v. New Orleans Stockyard, 226 La. 897, 906–907, 77 So.2d 528, 531 (1954); Garwin v. Anderson, 334 Mich. 287, 295–297, 54 N.W.2d 667, 670–671 (1952); Binz v. St. Louis Hide and Tallow Company, 378 S.W.2d 228, 230–231 (St.L.Mo.App.1964). His evidence does not justify more than a salary of $5000 per year for the years before us, fiscal years ending in 1968 through 1971. It follows he owes Holi-Rest the excess, a total of $95,000.

In addition, Treloar owes Holi-Rest $6000 which it reimbursed Mrs. Coll for money advanced to him, and $750 representing the value of the car Mrs. Coll "turned in" for a consideration flowing from the corporation.

The petition prays that exemplary damages be awarded Holi-Rest.

In *Holden,* supra, 202 N.W.2d at 359 we said:

"[I]n a stockholder's derivative action an equity court may, in its discretion,

award exemplary damages upon a showing that some legally protected right has been invaded, such as an intentional act of fraud or other wrongful conduct.

"* * * *

"* * * [A]n intentional act of fraud in a court of equity includes all acts, omissions and concealments which involve a breach of either legal or equitable duties, trust or confidence, justly reposed, which are injurious to another or by which an undue or unconscionable advantage is taken."

See also *Charles v. Epperson & Company*, supra, 258 Iowa at 432, 137 N.W.2d at 618–619.

■ Treloar's flagrantly wrongful acts, omissions and concealments have been injurious to the corporation and its stockholders. Without question, his self-dealing has caused the corporation losses not only in the sums above specified but in undetermined amounts which under this record cannot be ascertained. We hold Holi-Rest is entitled to exemplary damages from Treloar in the amount of $25,000.

■ IV. *Attorney fees.* Although trial court cited authorities relating to the award of attorney fees in derivative actions, it made no findings or orders touching on this subject. Such an allowance from the corporation to Mrs. Coll for attorney fees and litigation expenses should be made under the principles articulated in *Holden*, supra; *Berger v. Amana Society*, supra; and *State v. Bechtel*, 244 Iowa 785, 56 N.W.2d 173 (1952). See also 19 Am. Jur.2d, Corporations § 588, pp. 111–12.

The success of counsel for the minority stockholder in this case is an indication of their skill, particularly when viewed in light of the ability, standing and tenacity of opposing counsel. See *Berger v. Amana Society*, supra, 257 Iowa at 967, 135 N.W.2d at 622. The value of plaintiff's counsel to the corporation is measured not only by the recovery fixed in this

opinion, but by their service in exposing and redressing Treloar's breaches of other corporate functions and duties. See *Holden*, supra, 202 N.W.2d at 365.

Efforts of counsel on Mrs. Coll's individual claim to secure a redistribution of corporate stock should not be compensated by the corporation. Accordingly, we hold plaintiff Mrs. Coll is entitled to judgment against Holi-Rest for an amount equal to sixty percent of all reasonable attorneys' fees and litigation expenses incurred by her in the trial of this case and subsequent appeal. Upon remand trial court shall determine the amount to be allowed for such fees and expenses and enter appropriate judgment.

V. *Other remedial relief.* In the opinion of this court, it will not suffice merely to render judgment for Holi-Rest against Treloar. He concedes he manipulates that corporate entity for his own interests. We believe it necessary to prescribe affirmative remedial measures to protect the interests of the corporation and Mrs. Coll, who apparently is now the sole minority stockholder.

■■ That this court has the power in equity to fashion such relief is beyond dispute. This power is invoked by plaintiffs' prayer for general equitable relief. We have frequently said such a prayer is to be construed liberally, and will often justify granting relief in addition to that contained in the specific prayer, provided it fairly conforms to the case made by the petition and the evidence. *Myers v. Smith*, 208 N.W.2d 919, 922–923 (Iowa 1973); *Baldwin v. Equitable Life Assur. Soc.*, 252 Iowa 639, 651–652, 108 N.W.2d 66, 74 (1961).

In *State v. Bechtel*, 239 Iowa 1298, 1313, 31 N.W.2d 853, 861 (1948), we approvingly quoted the following from 1 Story, Equity, § 95, p. 96 (14th ed. 1918):

"If based on sound principles, and beneficent results follow their enforcement, affording necessary relief to the one

party without imposing illegal burdens on the other, new remedies and unprecedented orders are not unwelcome aids to the chancellor to meet the constantly varying demands of equitable relief."

Also pertinent here is the following from *Holden,* supra, 202 N.W.2d at 363–364:

" 'Wherever a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation, though no similar relief has been given before.' McClintock on Equity, § 29 at 76 (2d ed. 1948)."

■ In rare instances the corporate entity barrier has been short-circuited to permit a direct recovery by stockholders against controlling stockholders and officers. See Perlman v. Feldmann, 219 F.2d 173 (2d Cir. 1955); Brown v. De Young, 167 Ill. 549, 47 N.E. 863 (1897); Gieselmann v. Stegeman, 443 S.W.2d 127 (Mo. 1969); Chounis v. Laing, 125 W.Va. 275, 23 S.E.2d 628 (1942); Young v. Columbia Oil Co., 110 W.Va. 364, 158 S.E. 678 (1931). Ordinarily, however, such expeditious relief is denied as a threat to third party interests—for example, bona fide corporate creditors. See Berger, "Disregarding The Corporate Entity" For Stockholders' Benefit, 55 Col.L.Rev. 808, 823 (1955); Comment, Corporations: Disregard of The Corporate Entity For The Benefit of Shareholders, 1963 Duke L.J. 722, 728–30.

We have likewise rejected the concept of decreeing this corporation be liquidated and dissolved. Mrs. Coll does not suggest such relief, and in any event, it is still available to her under § 496A.94(1), The Code.

■ We deem it essential to appoint a special fiscal agent to take control of the corporation and its financial affairs in order to protect the short-term rights of it and the minority stockholder. This is a remedy permitted in our sound legal discretion. See *Holden,* supra, 202 N.W.2d at 360; Roach v. Margulies, 42 N.J.Super. 243, 246, 126 A.2d 45, 47 (1956); §§ 491.-66, 680.1, 680.2, The Code.

We therefore remand this cause to trial court with directions to enter a decree in conformance herewith which minimally shall incorporate the following features:

(1) Judgment against defendant Treloar and in favor of Holi-Rest, Inc. in the total sum of $126,750.

(2) Appointment of an impartial, qualified person as special fiscal agent, who upon posting bond and qualification shall immediately assume exclusive control and operation of the Holi-Rest corporation, its corporate books and records and its financial affairs. This agent shall have the further powers and duties:

(a) To take all legal steps to collect the judgment referred to above.

(b) To distribute the proceeds of said judgment, when collected, for the following purposes in the priority of listing:

(1) for his compensation and expenses as fixed by the court upon proper application,

(2) for bona fide corporate indebtedness (other than to Treloar), incurred prior to this decision, which cannot be paid out of current receipts,

(3) for payment of the judgment to be rendered in favor of Mrs. Coll, for her attorney fees and legal expenses,

(4) for a dividend in the amount of the balance then remaining to the stockholders as their stock ownership may be established as of the dividend date, provided however, the amount due Treloar may be withheld as a potential offset against any additional sums found to be owing the corporation by him,

(5) for current operating expenses, if required.

(c) To file satisfaction of the judgment against Treloar only when said judgment and the costs taxed to him have been fully paid.

(d) To audit or cause to be audited all transactions between Treloar (or businesses owned or controlled by him) and Holi-Rest subsequent to February 28, 1971 and report to trial court any unreasonable or unfair transactions and request permission to seek reimbursement by litigation or other means.

(e) To serve until his above duties have been fully performed at which time he shall file accounting and application for discharge.

(3) An injunction against defendant Treloar, prohibiting him from:

(a) participating in the management or control of Holi-Rest, Inc., until the judgment against him and in favor of the corporation is fully satisfied and the special fiscal agent is discharged,

(b) receiving, directly or indirectly, any payments or property from Holi-Rest, Inc., for compensation, salary, alleged indebtedness, contract, or for any other reason or consideration, while the aforesaid judgment against him remains unpaid,

(c) interfering in any way with management and control of Holi-Rest, Inc. by the special fiscal agent, or taking any overt action detrimental to the corporation or the business it conducts.

(4) A judgment against Holi-Rest, Inc. and in favor of Mrs. Coll for her attorney fees and legal expenses, the amount to be determined in the manner indicated in this opinion.

(5) A retention of jurisdiction over the parties and subject matter to make further orders to protect the corporation and minority stockholder until the aforesaid judgments are fully paid and the special fiscal agent discharged.

Costs attendant upon this appeal are taxed one-fourth to Mrs. Coll and three-fourths to Treloar.

This case is affirmed in part, reversed in part, modified on both appeals, and remanded with instructions.

Affirmed in part, reversed in part, modified and remanded with instructions.